**Entered on Docket**
**July 02, 2009**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



**Signed and Filed: July 02, 2009**

_Dennis Montali_
_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case |
| | ) No. 03-32715DM |
| BROBECK, PHLEGER & HARRISON LLP, | ) |
| | ) |
| Debtor. | ) Chapter 7 |
| _____ | ) |
| RONALD F. GREENSPAN, Chapter 7 | ) Adversary Proceeding |
| Trustee for Brobeck, Phleger & | ) Nos. 08-3027 & 08-3028 |
| Harrison LLP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ORRICK, HERRINGTON & SUTCLIFFE LLP, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| RONALD F. GREENSPAN, Chapter 7 | ) |
| Trustee for Brobeck, Phleger & | ) |
| Harrison LLP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DORSEY & WHITNEY LLP, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

MEMORANDUM DECISION REGARDING JEWEL V. BOXER CLAIMS

AND FRAUDULENT TRANSFERS

**I. INTRODUCTION**

This case presents the court with a matter of apparent first

-1-

impression: a dramatic intersection of well-established and
necessary rules appropriate for the winding up and dissolution of
a law firm with the equally well-established principles
recognizing rights of third-party creditors that protect them from
the adverse financial consequences of an otherwise valid
transaction.  In a time when the financial collapse of legacy
institutions can occur quickly, a last minute attempt at order
rather than chaos cannot prevail over the rights of that firm's
creditors.

Plaintiff, Ronald F. Greenspan, chapter 7[1] trustee (the
"Trustee") for the estate of former law firm, Brobeck, Phleger &
Harrison LLP ("Brobeck"),[2] seeks to invalidate eleventh hour
amendments to Brobeck's partnership agreement, and to recover
allegedly fraudulently transferred profits from Brobeck's
unfinished business and partnership opportunities from ten former
Brobeck partners (individually, "Partner Defendant," collectively,
the "Partner Defendants") who moved to either Defendant Orrick,
Herrington & Sutcliffe LLP ("Orrick", collectively with its former
Brobeck partners, the "Orrick Defendants") or Defendant Dorsey &
Whitney LLC ("Dorsey", collectively with its former Brobeck

---

[1] Unless otherwise indicated, all chapter, section and rule
references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and
to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037, as
enacted and promulgated prior to the effective date of The
Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,
Pub. L. 109-8, 119 Stat. 23.

[2] As of January 1, 1999, the California Revised Uniform
Partnership Act found in Corp. Code § 16100 et. seq. ("RUPA")
governs all California partnerships, including those formed before
January 1, 1997, thus replacing the former Uniform Partnership Act
("UPA") in its entirety.  See RUPA § 16111.  It is undisputed that
Brobeck, a limited liability partnership, is governed by RUPA.

Case: 08-03028   Doc# 69   Filed: 07/02/09   Entered: 07/02/09 13:19:37   Page 2 of 49

partners, the "Dorsey Defendants") as well as from Orrick and Dorsey (collectively the "Firms," and together with the Partner Defendants, the "Defendants") following Brobeck's dissolution. The Trustee moves for partial summary judgment on claims for relief 1, 3, 5, and 6 through 9 ("Claims") in his complaints filed in the above-captioned adversary proceedings.  The Defendants move for summary judgment on all nine of Trustee's Claims.

For the reasons explained in the following discussion, the court recognizes that attorneys in a failing firm can patch up their differences with an agreement that is valid and proper under applicable law and decide to go their separate ways.  Accordingly, the Trustee's direct attack on their successful effort to avoid the consequences of doing nothing must fail and Defendants are entitled to summary judgment on Claims 1 through 5.  But because they did not guard against such failure until the firm succumbed to insolvency, the Trustee's alternative attack under the fraudulent transfer laws must succeed, and he is entitled to partial summary judgment on Claims 7 and 9 for constructive fraud under state and federal law, except with respect to Partner Defendants James P. Baker ("James Baker"), Grady Bolding ("Bolding"), and Gabrielle M. Wirth ("Wirth"), as explained further in the Memorandum Decision.

## II. BACKGROUND[3]

Brobeck started business in 1926.  It was a prominent

---

[3] This Memorandum Decision constitutes the court's findings of fact and conclusions of law pursuant to Rule 7052(a).  While findings of fact are not normally necessary on summary judgment motions, it seems appropriate here to provide context.  No material facts described are in dispute.

-3-

national law firm with over 900 attorneys and offices in
California, New York, Colorado, Virginia, Texas, Washington D.C.,
and, through a joint-venture, in London, England.  In the late
1990's and early 2000s, Brobeck enjoyed rapid growth, almost
doubling its number of attorneys in just over three years.  This
was due primarily to its booming technology-sector practice.  In
the course of its expansion, Brobeck incurred substantial debt as
well as lease obligations for several new offices.  However, as
they say, all good things must come to an end.

In January 2002, Brobeck and its primary lender, Citibank,
F.S.B. ("Citibank"), executed a credit agreement by which Citibank
acquired liens on all of Brobeck's accounts receivable, unbilled
time and other assets.  During 2002, Brobeck was experiencing
financial difficulties, and in December 2002, after several
partners had left Brobeck, Citibank sent notice to Brobeck's
management that it was in default under the agreement.
Brobeck and Citibank then renegotiated their credit agreement and
on January 22, 2003, entered into an amended security agreement in
favor of Citibank.  At or around the same time, Brobeck pursued
merger negotiations with Morgan, Lewis & Bockius LLP ("Morgan
Lewis").  Also on January 22, 2003, Brobeck's chairman sent an
email to all partners entitled "OUR FIRM: Restructuring Complete!"
However, on January 29, 2003, Brobeck's discussions with Morgan
Lewis ended unsuccessfully and on January 30, 2003, management
announced to the partners that the merger had failed and Brobeck
would soon dissolve.

Meanwhile, Brobeck's Policy Committee prepared a dissolution
agreement.  Partner Defendant Bolding and others drafted what

-4-

became Brobeck's Final Partnership Agreement ("FPA"), effective February 10, 2003. As part of the FPA, Brobeck's Policy Committee asked Bolding to address the unfinished business rule and any <u>Jewel</u>-related liability, which stems from the seminal California Court of Appeal decision, <u>Jewel v. Boxer</u>, 156 Cal. App. 3d 171 (1984) ("Jewel").

The unfinished business rule provides that, in the absence of an agreement to the contrary, partners have a duty to account to the dissolved firm and their former partners for profits they earn on the dissolved firm's "unfinished business," after deducting for overhead and reasonable compensation.[4] In other words, profits realized by former partners at their new firms must be shared among all partners of the dissolved firm in accordance with the firm's prior practice. The <u>Jewel</u> partners had no written agreement to deal with the firm's dissolution. The court's opinion chided them for that omission, and virtually invited law partnerships to have such an agreement. <u>Id.</u> at 179-80. RUPA expressly authorizes partners to do exactly that.

Many Brobeck partners, including the Partner Defendants, were all too familiar with <u>Jewel</u> and the duty to account because a law

---

[4] <u>Jewel</u> was decided under the UPA, which did not allow partners to receive extra compensation for conducting post-dissolution "wind-up" activities (except for surviving partners). RUPA has changed this rule. It allows partners reasonable compensation for services rendered in winding up the business of the partnership. <u>See</u> Cal. Corp. Code § 16401(h).

Under the scheme of RUPA, the profits from a dissolved partnership's unfinished business would appear to consist of the remainder from fees received minus overhead costs and reasonable compensation to the partner responsible for winding up the unfinished matter. For example, if a partner received $50,000 in fees but incurred $40,000 of costs for overhead and the partner's reasonable compensation to generate that $50,000 in fees, the profit for which that partner would have to account is $10,000.

-5-

firm had recently sued Brobeck for an accounting of profits

Brobeck earned on unfinished business completed by former partners

of that firm who went to Brobeck.

As planned, the FPA included an unfinished business agreement

set forth in Section 9(e) (the "Jewel Waiver").  It states, in

relevant part:

> Except as specifically set forth below, neither the
> Partners nor the Partnership shall have any claim or
> entitlement to clients, cases or matters ongoing at the
> time of the dissolution of the Partnership other than the
> entitlement for collections of amounts due for work
> performed by the Partners and other Partnership personnel
> on behalf of the Partnership prior to their departure
> from the Partnership.  The provisions of this Section
> 9(e) are intended to expressly <u>waive, opt out of and be
> in lieu of any right any Partner or the Partnership may
> have to 'unfinished business</u>' of the Partnership, as that
> term is defined in <u>Jewel v. Boxer</u>, or as otherwise might
> be provided in the absence of this provision through
> interpretation or application of the California Revised
> Uniform Partnership Act (emphasis added).[5]

The Jewel Waiver provided that Brobeck's partners would not

have a duty to account back to Brobeck or each other for Brobeck's

Unfinished Business with two exceptions - two ongoing contingency

matters - the Western MacArthur ("Western") insurance coverage

litigation and bankruptcy, and the Tickets.com litigation.  Those

two matters were "carved out" of Section 9(e) as an exception to

Unfinished Business as follows:

> (i) The Partners through the Partnership shall be and
> remain entitled to amounts to which any former Partner or
> Partners, or such former Partners' partners, employer or
> affiliates (collectively, the "New Entities") may
> otherwise become entitled in respect of amounts paid for
> legal services conducted after the former Partner's
> dissociation from the Partnership upon dissolution of the

---

[5] Throughout this Memorandum Decision, the court will use the
Brobeck partners' term "Unfinished Business" to describe what the
partners waived by the emphasized language, and the value of which
is part of what the Trustee seeks to recover.

-6-

Partnership, on ongoing business of Western MacArthur and MacArthur relating to the Chapter 11 proceedings of Western MacArthur Company and MacArthur Company and ongoing asbestos insurance coverage litigation, provided that in addition to offsetting costs, such New Entities shall be entitled to retain an amount in consideration of the value of the work performed on these matters by the New Entities. For purposes of this subparagraph (i), the value of the work so performed by New Entities after assumption of the case shall be equal to one hundred percent (100%) of the guideline hourly rates billed by the New Entities for work performed by any timekeeper, including the former Partner, and any member, shareholder, associate, legal assistant or paralegal of the New Entities, for the period in which the services were performed, plus a portion of any additional amounts earned above such hourly rates as follows . . . .

In essence, this agreement waived <u>Jewel</u> claims Brobeck would have had against its former partners and their new firms, and the partners' claims against one another, with the exception of Western and Tickets.com.

On February 9, 2003, Brobeck's Policy Committee circulated the proposed FPA, a cover letter, and a two and one-half page memo (the "Consent Memo") explaining the FPA's key provisions to all partners. The Consent Memo solicited consents to the FPA, and Paragraph 7 of that Memo references the Jewel Waiver and <u>Jewel</u>. In Paragraph 7, the Policy Committee told partners that "[e]xcept with respect to [Brobeck's] interest in the Western MacArthur and Tickets.com cases, the 'unfinished business' doctrine of Jewel v. Boxer is waived" and that "[t]his allows all Partners to go on to other law firms with their clients and matters and not be under a cloud of having to account back to Brobeck or other Partners for revenue they generate." Brobeck's right to receive profits from work in Western and Tickets.com was not affected by the Jewel

-7-

Waiver.[6]

Over the next two days, via email, telephone conferences and other meetings, the partners discussed the proposed FPA and Jewel Waiver, Brobeck's liquidation plans, funding its liquidation committee, capital calls, storage of client files and retirement accounts. The partners then voted on the FPA.

On February 11, 2003, the Policy Committee certified that a sufficient number of partners had consented to the FPA, and thus it was approved.[7] After 77 years in business Brobeck proceeded to dissolve under RUPA § 16801 et. seq.[8]

After Brobeck's dissolution, but prior to its bankruptcy in September 2003, several Brobeck partners moved on to various firms, including Orrick and Morgan Lewis. Some of these Brobeck partners were key counsel in the Western case while it was a client of Brobeck. In order to ensure Brobeck would receive the

_____

[6] The Tickets.com matter ended up a total loss and its exclusion from the Jewel Waiver is irrelevant to the matters before the court.

[7] Each Orrick Partner Defendant admits that he either consented to the FPA or, if not, it should apply to him. The Dorsey Partner Defendants generally did not recognize the document, but either had no reason to believe it was not the FPA, and/or relied on the FPA in his or her interrogatory responses.

[8] It is undisputed that Partner Defendants Bolding, James Baker, Jeffrey D. Hermann ("Hermann") and Frederick D. Holden, Jr. ("Holden"), all of whom went to Orrick, were partners at Brobeck on January 30, 2003, when Brobeck's management announced the dissolution. After the dissolution announcement, but before the dissolution date, Partner Defendants Baker, Bolding and Holden resigned from Brobeck and accepted offers from Orrick; Hermann joined Orrick after the dissolution.
Partner Defendants Patrick Arrington ("Arrington"), John S. Baker ("John Baker"), Ellen S. Bancroft ("Bancroft"), David L. Hayes ("Hayes"), Scott R. Santagata ("Santagata") and Wirth, all of whom went to Dorsey, were partners at Brobeck's Irvine, California office when Brobeck announced its dissolution and on the dissolution date.

-8-

Western contingency fees excluded from the Jewel Waiver, if any,
Brobeck, Morgan Lewis and Orrick entered into an agreement to
continue representation.  As part of that agreement, the parties
implemented an incentive contingency bonus fee arrangement which
included three bonuses.  In order for Brobeck to earn any of the
bonuses certain objectives had to be achieved, such as obtaining
the Western bankruptcy court's approval of Western's plan of
reorganization.  Under the arrangement, the bonuses would be
allocated to Brobeck, Morgan Lewis and Orrick.  However, Orrick's
bonus was contingent upon any bonus being paid to Morgan Lewis:
Orrick would receive 50% of all bonus fees paid to Morgan Lewis,
up to a cap of $500,000.  Additionally, if Morgan Lewis received
and retained less than $1 million, Orrick would receive only 50
cents for every dollar Morgan Lewis received.  If Morgan Lewis
ended up with nothing, Orrick would recover nothing.

Ultimately, the goals in Western were achieved and Brobeck's
share of Bonus 1, which came after Brobeck's bankruptcy, was
allocated among the Brobeck estate, Morgan Lewis and Orrick.
Since Morgan Lewis received over $1 million in bonus fees from
Bonus 1, Orrick received its cap of $500,000 and thus received
nothing from Bonus 2 or 3.  Those bonuses were allocated between
Brobeck's estate and Morgan Lewis.  Orrick contends that under the
fee arrangement, its bonus fees were to be paid directly from
Morgan Lewis; the Trustee contends that Orrick's bonus was to come
from Brobeck's estate, which it eventually did.

Although not pled specifically in his complaint against the
Orrick Defendants, it appears the Trustee seeks to recover
Orrick's $500,000 bonus as a subset of Brobeck's Unfinished

-9-

Business profits.

The record reflects that Partner Defendants James Baker, Hermann and Holden, all of whom went to Orrick, were responsible for and completed Unfinished Business for several former Brobeck clients while at Orrick, for which Orrick received a confidential amount of revenue resulting in some retained profit.[9]  Partner Defendants Arrington, John Baker, Bancroft, Hayes, Santagata and Wirth, all of whom went to Dorsey, completed Unfinished Business for several former Brobeck clients while at Dorsey, for which Dorsey received a confidential amount of "revenue."  Although the Trustee alleges Dorsey had profits from Unfinished Business, the Dorsey Defendants claim otherwise.  The documents in evidence do not conclusively establish whether Dorsey realized any profits from Unfinished Business.[10]

Other than Brobeck's right to the potential profits from the Western and Tickets.com contingency fee matters, on its face the Jewel Waiver is not contingent upon receipt of any payment or other consideration from the Brobeck partners, or their new firms. It is undisputed that neither of the Firms nor any Partner Defendant turned over any portion of Unfinished Business profits or paid anything to the Trustee or Brobeck's estate on account of such profits.

Finally, for purposes of this proceeding, the Defendants do

---

[9] Whether Partner Defendant Bolding completed Unfinished Business is also in dispute.

[10] Although the record is inconclusive as to whether Dorsey realized any net profits from Unfinished Business, the court rejects Dorsey's unsupported contention that only files opened within the first 90 days of Brobeck's dissolution should be considered in the profit/loss analysis.

-10-

1 not contest that Brobeck was insolvent at the time of the Jewel
2 Waiver.

3 **III. PROCEDURAL HISTORY**

4     On September 17, 2003, certain of Brobeck's creditors filed
5 an involuntary chapter 7 bankruptcy petition.  Following his
6 election, the Trustee asserted claims against Morgan Lewis and
7 Clifford Chance LLP, the two firms that hired the largest numbers
8 of Brobeck partners, and commenced adversary proceedings against
9 222 individual Brobeck partners.  By late 2004, the Trustee
10 settled all of his claims with Clifford Chance LLP and Morgan
11 Lewis, including a claim against Morgan Lewis on a <u>Jewel</u> theory
12 for its share of the profits earned on the Western representation.
13 That settlement resulted in Morgan Lewis returning almost all of
14 its share of the Western bonus fees.

15     Later, the Trustee entered into written settlement agreements
16 with nearly all of the remaining Brobeck partners, including each
17 Partner Defendant at Orrick and at Dorsey.  Through those
18 agreements, he released the Partner Defendants from all claims,
19 except claims "arising out of, related to or in connection with,
20 or based in whole or in part on the decision in <u>Jewel v. Boxer</u> and
21 the provisions of UPA or RUPA that formed or that would form the
22 statutory underpinning of any <u>Jewel v. Boxer</u>-type claim."  In
23 September 2005, the Trustee and Defendants executed a tolling
24 agreement which tolled the statute of limitations applicable to
25 any <u>Jewel</u> claim the Trustee might assert against them.

26     On March 28, 2008, the Trustee filed two complaints alleging
27 the exact nine Claims against the Defendants, thereby commencing
28 these two adversary proceedings.  Claim 1 seeks a declaration that

-11-

the profits the Firms received completing matters originating from Brobeck belong to Brobeck pursuant to RUPA § 16404(b)(1) and Jewel.  Claim 2 seeks an accounting and turnover order under section 542 with respect to such alleged Unfinished Business profits.[11]  Claims 3 and 4 are similar to the first two, but instead of Unfinished Business profits the Trustee seeks an accounting and turnover of the profits the Firms earned on partnership opportunities.[12]  Claim 5 seeks a declaration that the Jewel Waiver was an "unlawful waiver" within the meaning of RUPA § 16103(b)(3).  Claims 6, 7, 8 and 9 allege that the Jewel Waiver effected an actual or constructive fraudulent transfer within the meaning of state and federal law.

On February 27, 2009, the Trustee filed his combined partial motion for summary judgment, moving for judgment on Claims 1, 3, 5, and 6 through 9.  On that same date, the Defendants filed their respective motions for summary judgment, moving for judgment on all nine of Trustee's Claims.  The parties agreed to a bifurcation of this litigation into liability and damages phases.  Therefore, if the Jewel Waiver is invalid, or if it was a fraudulent

---

[11] Section 542 provides, in relevant part:

(a) an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property . . . .

[12] The Trustee contends that partnership opportunities includes profits received from business, apart from Unfinished Business, handled by the Firms for a former Brobeck client which had not previously been a client of the Firms ("Partnership Opportunities").  He alleges that at least one Partner Defendant, Holden, engaged in Partnership Opportunities for which Orrick received profits.

-12-

transfer, the Trustee must prove in phase two of this litigation
what damages he may recover.

The motions were set for oral argument on April 13, 2009.[13]
On April 9, 2009, the court issued a Tentative Ruling ("TR"),
indicating summary judgment in favor of the Defendants on Claims
1, 2, 3, 4 and 5, and denial of all motions as to Claims 6, 7, 8
and 9. (See Dkt. No. 37 in A.P. 08-3027, and Dkt. No. 66 in A.P.
08-3028).

At the beginning of the April 13 hearing, the Trustee offered
to accept the TR and argue only for Claims 6, 7, 8 and 9 - the
various fraudulent transfer claims. Defendants declined this
offer and chose to argue on all nine Claims.

**IV. DISCUSSION**

Motions for summary judgment under Fed. R. Civ. P. 56 are
made applicable here by Rule 7056. Summary judgment should only
be granted "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law." Fed. R. Civ. P. 56(c).

The evidence is construed in the light most favorable to the
nonmoving party, and the moving party bears the burden to show the
absence of any genuine issue of material fact. Hopkins v. Andaya,
958 F.2d 881, 884 (9th Cir. 1992). "However, once the moving
party demonstrates the absence of a genuine issue of material

---

[13] The adversary proceedings were consolidated for oral
argument and disposition.

-13-

1  fact, the burden shifts to the nonmoving party to produce evidence

2  sufficient to support a jury verdict in [the nonmoving party's]

3  favor."  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256-57.

4  Id. at 884-85.

5      No genuine issue of fact exists if the party opposing the

6  motion "fails to make a showing sufficient to establish the

7  existence of an element essential to that party's case, and on

8  which that party will bear the burden of proof at trial."  Celotex

9  Corp. v. Catrett, 477 U.S. 317, 322 (1986).

10 **A.   Was The Jewel Waiver Valid?**

11

12      The Trustee argues that he is entitled to the profits

13 realized on Brobeck's Unfinished Business and Partnership

14 Opportunities for two reasons: (1) RUPA § 16404(b)(1) provides and

15 Jewel holds that unfinished business remains property of a law

16 partnership, unless there is a contrary agreement, and (2) the

17 contrary agreement here was an unlawful waiver of the Brobeck

18 partners' duty of loyalty and invalid under RUPA §§ 16103(b)(3)

19 and 16404, or was manifestly unreasonable, triggering the default

20 rules of RUPA and Jewel and rendering Brobeck's Unfinished

21 Business profits and Partnership Opportunities property of its

22 estate.

23      In opposition, the Defendants[14] argue that under Jewel

24 partners are permitted and encouraged to modify contractually

25 their duties to account for profits earned on Unfinished Business,

26

27      [14] The Dorsey Defendants adopt all of the arguments raised by
   the Orrick Defendants in opposition to the Trustee's motion on
28 Claims 1 through 5.

-14-

that the Jewel Waiver complied with the provisions of RUPA, and it
was not manifestly unreasonable.[15]  More specifically, as to the
Partnership Opportunities claim, the Defendants argue that once a
partnership is dissolved it has no claim to "new" matters, even
matters from former clients, because such new matters do not
constitute Unfinished Business.  They further contend that the
Trustee is barred from bringing such a claim because the previous
settlement agreements with the Partner Defendants carved out only
"<u>Jewel</u>-type claims," and since Partnership Opportunities fall
outside of that definition, the relevant statute of limitations
had run.[16]

    In their own motions, with respect to Claims 1 through 5, the

---

[15] In the alternative, the Defendants contend that the
Trustee's Claims should be denied because he has failed to prove
they earned any recoverable Unfinished Business profits within the
applicable one-year time limit after Brobeck's dissolution, citing
<u>Official Comm. of Unsecured Creditors v. Ashdale (In re Labrum &
Doak, LLP)</u>, 227 B.R. 391 (Bankr. E.D. Pa. 1998).
    The court rejects a time limit on recovery.  In <u>Labrum &
Doak</u>, the recovery period was limited to one year simply because
that is all the creditor's committee requested.  Unfinished
business exists until it is finished, and therefore the Trustee,
if entitled, can recover any realized Unfinished Business profits
no matter when such business was or is concluded.

[16] As to the Partnership Opportunities claim, in the TR the
court noted that Brobeck had no ability to exploit any such
opportunities once it dissolved.  Furthermore, the Brobeck
partners could not be liable for taking on what would be
considered "new" business, even if that "new" business involved
representing former Brobeck clients.  Based on that, the court
declined to address the statute of limitations issue.
    The Trustee accepted the TR with respect to this Claim.
Consequently, as the Trustee conceded, there can be no accounting
or turnover of Partnership Opportunities profits that do not
exist, as he requested in Claim 4.  Therefore, the Defendants are
entitled to summary judgment on Claims 3 and 4, and those Claims
will not be discussed further.

-15-

Case: 08-03028   Doc# 69   Filed: 07/02/09   Entered: 07/02/09 13:19:37   Page 15 of
49

Defendants[17] contend that since the Jewel Waiver was valid and enforceable and defined the extent of Brobeck's interest in its Unfinished Business, which is none with respect to hourly rate matters, the Trustee lacks standing to even bring such claims.[18] Moreover, they believe that <u>Jewel</u> does not apply to them for five reasons: (1) the Jewel Waiver precludes its application; (2) RUPA, unlike the UPA, allows partners reasonable compensation for post-dissolution work in completing unfinished business, and thus the profit earned here is the reasonable compensation, at least on hourly rate matters; (3) the California Supreme Court would not apply <u>Jewel</u> as to non-contingency matters since after a partnership has dissolved no one is left to complete the work; (4) <u>Jewel</u> has only been applied against former partners and not to the law firms those partners later join, so the Trustee has no claim against the Firms; and (5) the rule cannot support a claim against the Defendants because it fails to seek an accounting from all

---

[17] The Orrick Defendants adopt all of the arguments raised by the Dorsey Defendants in support of Dorsey's motion for summary judgment on Claims 1 through 5, and vice versa.

[18] The court agrees with Defendants. Because the FPA complied with RUPA, the Trustee, on behalf of Brobeck, lacks standing to assert claims for breaches of fiduciary duty (the essence of Claims 1 through 5) since such claims can be prosecuted only by partners against partners. Brobeck's rights and powers are defined by the partnership agreement that created and continues it. Under section 541, the Trustee takes Brobeck's pre-petition powers and the limitation on those powers, and unless Brobeck could sue the partners the Trustee cannot. 3 <u>Collier on Bankruptcy</u> § 323.03[2] at 323-9 (15th ed. rev. 2009)(trustee stands in shoes of the debtor and can only assert those causes of action possessed by the debtor). It is doubtful that Brobeck, governed by the partners' vote, could sue the very owners who voted to change the partnership agreement.

-16-

160+ Brobeck partners as required by Cal. Civ. Proc. § 389(c).[19]

Finally, they assert that the Brobeck partners thought that eliminating the duty to account back to each other for their hourly rate work would avoid years of litigation, thus benefitting Brobeck and its creditors.

**B.    The Jewel Waiver Was Valid.**

   **1.    The Waiver Complied With _Jewel_.**

Under California law, the unfinished business of a law partnership is any business covered by retainer agreements between the firm and its clients for the performance of partnership services that existed at the time of dissolution.  _Rosenfeld, Meyer & Susman v. Cohen_, 146 Cal. App. 3d 200, 217 (1983).  It includes matters in progress but not completed when the firm is dissolved, regardless of whether the firm was retained to handle the matters on an hourly or a contingency basis; what constitutes unfinished business must be determined on the date of dissolution of the partnership, not based on events occurring thereafter. _Rothman v. Dolin_, 20 Cal. App. 4th 755, 759 (1993).[20]  Absent an

_____

[19] Cal. Civ. Proc. § 389(c) provides:

A complaint or cross-complaint shall state the names, if known to the pleader, of any persons as described in paragraph (1) or (2) of subdivision (a) who are not joined, and the reasons why they are not joined.

Because the court concludes that the Jewel Waiver was valid under _Jewel_ and RUPA, there is no need to reach a conclusion on this procedural issue.  Nonetheless, the Trustee is free to sue one, some, or all of the former Brobeck partners for fraudulent transfer.

[20] The court rejects the Defendants' argument that under RUPA unfinished business does not include hourly rate matters.  _See Rothman_, _supra_.  Although Defendants cite a New York case, _Gottlieb v. Greco_, 749 N.Y.S. 2d 19 (N.Y. App. Div. 2002), and

-17-

agreement to the contrary, partnership assets include attorneys

fees received by the partnership for cases in progress at

dissolution, and such fees, minus overhead and reasonable

compensation, must be shared among all partners in accordance with

the ownership interest of each, regardless of which partner

performs the services for winding up purposes. <u>Jewel</u>, 156 Cal.

App. 3d at 179. However, a critical distinction exists between

"unfinished business," which remains a partnership asset and for

which each partner has a fiduciary duty to complete, and "new"

business which is not a partnership asset and may follow the

individual partner.

On February 9, 2003, the day before the FPA became effective

and the firm was a going concern, Brobeck had unfinished business

and an interest in the profits therefrom, and on February 10,

2003, Brobeck no longer had that interest. In the Jewel Waiver

itself, Brobeck and its individual partners waived certain rights.

The dispute lies in whether the Brobeck partners properly drafted

contend that its holding suggests courts generally apply the
unfinished business rule only to claims for a share of contingency
fees, the court disagrees with Defendants' interpretation of that
case. In <u>Gottlieb</u>, the partner was suing for a division of
contingency fees, so how the court would have determined hourly
fees, which were not at issue, is unknown. Defendants cannot make
the leap, based on <u>Gottlieb</u>, that courts only apply the unfinished
business rule in disputes over contingency fees. Moreover, New
York is not governed by RUPA.
    Arguably, <u>Rothman</u> was decided under the UPA, and possibly
RUPA changed the landscape. However, recent California
unpublished decisions since <u>Rothman</u> governed by RUPA continue to
cite <u>Rothman</u> as the law in this state. <u>See</u> <u>Kuist v. Hodge</u>, 2008
WL 510075, ¶ 11 (Cal. App. 2 Dist. 2008). Furthermore, the plain
language of RUPA makes no distinction between contingency or
hourly rate matters in the context of unfinished business. The
court declines Defendants' invitation to speculate as to how the
California Supreme Court would decide this issue.

-18-

around the default rules of RUPA and <u>Jewel</u> when they agreed not to account for profits derived by each partners' completion of Brobeck's Unfinished Business, and allowed the partners and their respective firms to keep those profits.

<u>Jewel</u> involved a four partner law firm that had no partnership agreement. The partners mutually agreed to dissolve the partnership, and litigation later ensued over the proper allocation of profits received from cases in progress at the time of dissolution. The California Court of Appeal held that "absent a contrary agreement, any income generated through the winding up of unfinished business is allocated to the former partners according to their respective interests in the partnership." <u>Jewel</u>, 156 Cal. App. 3d at 176. Therefore, to avoid this harsh result, <u>Jewel</u> held that a partnership agreement can set forth precise rules for completion of unfinished business. <u>See</u> <u>Rothman</u>, 20 Cal. App. 4th at 759 n.4 ("Of course, the parties were free to enter into an agreement providing for the allocation of fees relating to unfinished business in any manner they wished").

<u>Jewel</u> and <u>Rothman</u> not only allow contrary agreements, they encourage partners to enter into such agreements, which can only aid in the timely and organized winding up of the partnership's affairs. Without an express agreement, especially in the context of a law partnership where completion of ongoing partnership business can be protracted, the default rules on unfinished business can result in undesirable consequences between partners and/or their former firm.

Therefore, the court concludes that the Brobeck partners were

-19-

free, and indeed encouraged, to enter into a contrary agreement on
how they wished to handle Brobeck's Unfinished Business.  The
Brobeck partners took the clear message from <u>Jewel</u> - an agreement
that immediately disposes of unfinished business and minimizes the
disruptive impact of a dissolution is appropriate, and the court
will not fault them for complying with this aspect of California
law.[21]

**2.    The Waiver Complied With RUPA.**

The analysis does not end here.  The Trustee argues that in
order to be valid, the Jewel Waiver must also comply with RUPA §§
16404(b)(1) and 16103(b)(3).[22]  In sum, RUPA § 16404(b) sets forth

---

[21] It is only the impact of such an agreement on creditors
where the Jewel Waiver creates a potential for liability of the
waiving partners and their new law firms.

[22] RUPA § 16404(b)(1) states:

(b) A partner's duty of loyalty to the partnership and the
other partners includes all of the following:

(1) <u>To account to the partnership and hold as trustee for it
any property, profit</u>, or benefit derived by the partner in
the conduct and winding up of the partnership business or
derived from a use by the partner of partnership property or
information, including the appropriation of a partnership
opportunity (emphasis added).

RUPA § 16103(b)(3) in relevant part states:

(b) The partnership agreement may not do any of the
following:

(3) Eliminate the duty of loyalty under subdivision (b) of
Section 16404 . . . but, if not manifestly unreasonable, may
do either of the following:

(A) The partnership agreement may identify specific
types or categories of activities that do not violate
the duty of loyalty.

(B) All of the partners or a number or percentage

-20-

a partner's limited duty of loyalty to the partnership and the other partners, which includes, among others, the duty to account for profits derived after dissolution. Further, RUPA § 16103(b) does not allow a partnership agreement, which governs the relationship among the partners and between the partners and the partnership, to eliminate the duty of loyalty in RUPA § 16404, but it does allow modification of this duty if not "manifestly unreasonable" and in compliance with either part (A) or (B).

The Trustee argues that the Jewel Waiver was invalid because it went outside the scope of the exceptions allowed under parts (A) and (B). As to part (A), he asserts that the FPA does not identify "specific types or categories of activities that do not violate the duty of loyalty." Specifically, he contends that neither the FPA nor the Consent Memo makes any reference to the Brobeck partners' duty of loyalty, and further, those documents do not indicate that keeping profits from Unfinished Business for themselves and their new firms would violate that duty.

As to part (B), the Trustee asserts that without any reference to the duty of loyalty, there could not have been an effective ratification of the Jewel Waiver as a breach of that duty because to be effective under California law there must be "full disclosure of all material facts." Skone v. Quanco Farms, 261 Cal. App. 2d 237, 241 (1968). Here, he argues, there was no disclosure let alone "full disclosure of all material facts."

specified in the partnership agreement may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty.

-21-

Alternatively, the Trustee argues that even if the Brobeck partners satisfied the requirements of parts (A) or (B), the Jewel Waiver's terms were manifestly unreasonable because, with the exception of Western and Tickets.com, it attempted a blanket derogation of the partners' duty to account to, and hold profits in trust for, Brobeck on account of Unfinished Business without sharing any of the profits with Brobeck. To make matters worse, he argues, the FPA did not require the partners to provide anything of value in exchange for being excused from that duty; the partners benefitted themselves at the expense of Brobeck's creditors.

The court rejects the Trustee's arguments. First, he offers nothing to support his suggestion that the words "duty of loyalty" must appear in the FPA to make it an effective modification. Although it may be a prudent exercise, the court disagrees that such language is required in order to make a valid modification to a partnership agreement under RUPA §§ 16103(b)(3)(A) or (B).

Second, the contention of inadequate disclosure of the material facts as between the parties is inaccurate. The record reflects that not only did all of the relevant documents explicitly disclose the details regarding Brobeck's Unfinished Business, but the partners engaged in substantial discussions about the proposed FPA and its various provisions by way of email, telephone conferences, and other meetings. The financial and professional (and personal) crises confronting the 160+ partners and their venerable law firm was fully understood, as were the ramifications of ignoring <u>Jewel</u>'s warning and doing nothing.

-22-

There is little doubt that they all knew what, and to whom, they were giving up and what they were getting in return from each other. This is not a case where a partner failed to disclose material facts to his or her partners in order to take advantage of what could have been a partnership opportunity to the partnership's detriment, or where a partner caused a wrongful dissolution in order to abscond with an opportunity for his or her own benefit. See Leff v. Gunter, 33 Cal. 3d 508 (1983). Therefore, the FPA complied with RUPA §§ 16103(b)(3)(A) and (B).

Finally, the court does not find any part of the FPA, including the Jewel Waiver, as manifestly unreasonable. RUPA does not define what is "manifestly unreasonable" and the parties have not cited, nor can the court locate, a decision that defines the term. Absent case law or even a dictionary definition, the court must rely on its common sense to recognize something as manifestly unreasonable. The Jewel Waiver was not.

RUPA defines the relationships between and among partners and their partnership. Further, by way of a partnership agreement, it allows the partners and the partnership to change contractually the rules of that relationship, which includes modifications to their duty of loyalty. The Jewel Waiver did not eliminate the partners' duty of loyalty, it only modified the duty to account, which is just one of the three duties of loyalty set forth in RUPA § 16404. The Brobeck partners had to account for certain matters, Western and Tickets.com, but had no duty to account for others.

The Trustee argues that since Brobeck was insolvent at the time of the Jewel Waiver and it benefitted only the partners at

-23-

the expense of Brobeck's creditors, then it was manifestly
unreasonable.  RUPA does not, as the Trustee suggests, govern a
partner's or a partnership's relations to, or rights of, third
parties such as creditors.  The California Legislature has enacted
other provisions regarding those relationships, one of which is
the Uniform Fraudulent Transfer Act.[23]  Therefore, solely in the
context of RUPA and the duty of loyalty to account, whether
Brobeck was insolvent at the time of the Jewel Waiver, whether the
partners provided anything of value in exchange for relieving each
other of that duty, or whether they benefitted from the Jewel
Waiver at the expense of Brobeck's creditors is irrelevant.

Consequently, since there are no genuine issues of material
fact in dispute regarding the validity of the Jewel Waiver, the
Defendants are entitled to summary judgment on Claims 1 and 5.[24]

**C.   Was The Jewel Waiver A Fraudulent Transfer?**

Even if the court determines that the Jewel Waiver was lawful
and valid under RUPA, the Trustee asserts it is nevertheless
avoidable as an actual or constructive fraudulent transfer under
the Bankruptcy Code and California Uniform Fraudulent Transfer
Act.  Consequently, he argues that under section 550(a), and/or
Cal. Civ. Code § 3439.07 and section 544(b)(1), he can recover for

---

[23] The California Uniform Fraudulent Transfer Act is contained
in Cal. Civ. Code §§ 3439 through 3449.

[24] The Defendants also move for summary judgment on Claim 2 -
accounting and turnover of profits from Brobeck's Unfinished
Business pursuant to section 542.  Because the court has
determined that the Jewel Waiver was valid, no accounting or
turnover of profits is required as a matter of law and Defendants
are entitled to summary judgment on Claim 2.

-24-

the benefit of Brobeck's estate its Unfinished Business profits
from the Partner Defendants, the initial transferees, and the
Firms, the immediate transferees.[25]  The Trustee has not conceded
that the RUPA calculation of profits would apply for purposes of
what he is entitled to recover from a fraudulent transfer, but
asserts that "the means of quantifying profits that can be
recovered by the Trustee will be the subject of the next phase of
this litigation," and "will likely involve expert testimony."[26]

The fraudulent transfer doctrine prevents debtors from
placing property beyond the reach of their creditors when those
assets should legitimately be made available to satisfy creditor
demands.  <u>See</u> <u>Chichester v. Mason</u>, 43 Cal. App. 2d 577, 584
(1941).  It is that doctrine that vindicates creditors' rights
notwithstanding the valid Jewel Waiver.

**1.   Unfinished Business Profits Were Property Of Brobeck.**

Before the court can determine whether there was a
"transfer," it must first determine that Brobeck's Unfinished

---

[25] Under section 550(a), a trustee may recover the property
transferred, or, if the court so orders, the value of such
property from the initial transferee of such transfer, or any
immediate or mediate transferee of such initial transferee.
   Under Cal. Civ. Code § 3439.07, in an action for relief under
Cal. Civ. Code §§ 3439.04 and 3439.05, a creditor may obtain
"[a]voidance of the transfer or obligation to the extent necessary
to satisfy the creditor's claim," and under Cal. Civ. Code §
3439.09, such action must be brought within four years after the
transfer.  And, under section 544(b)(1), the trustee "may avoid
any transfer of an interest of the debtor in property or any
obligation incurred by the debtor that is voidable under
applicable law by a creditor holding an unsecured claim that is
allowable under section 502 . . . ."

[26] Given the Trustee's position, the court is not determining
in this Memorandum Decision what profits the Trustee is entitled
to, if any, or how such profits will be calculated.

-25-

Business profits were "property" of Brobeck. <u>Wood v. Bright (In re Bright)</u>, 241 B.R. 664, 666 n.3 (9th Cir. BAP 1999). Both the "property" and "transfer" elements apply whether the claim is one for actual or constructive fraudulent transfer.

While the Bankruptcy Code does not define "property," Black's Law Dictionary defines it as "[t]he right to possess, use, and enjoy a determinate thing." <u>Black's Law Dictionary</u>, 1252 (8th ed. 2004). Although the Bankruptcy Code determines what is "property of the estate" under section 541,[27] state law determines the nature and extent of a debtor's interest in property. <u>Butner v. U.S.</u>, 440 U.S. 48, 54 (1979).

The Trustee contends that Unfinished Business (and the profit therefrom) is property under RUPA and <u>Jewel</u>, and that Brobeck had an interest in that property. The Defendants[28] contend that Brobeck's interest in its Unfinished Business profits arises only if the partnership agreement is silent, and since the Brobeck partners had a contrary agreement as of the date of dissolution, Brobeck's rights to Unfinished Business profits (other than those from Western and Tickets.com) were precluded and never "sprang" into existence. In other words, they analogize the Jewel Waiver to a disclaimer, a legal fiction which eliminates any property interest that a disclaimant previously held in the disclaimed property. A disclaimant neither transfers nor possesses an

_____

[27] Section 541 defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case."

[28] The Dorsey Defendants adopt all of the arguments raised by the Orrick Defendants in their motion for summary judgment on Claims 6, 7, 8 and 9, and vice versa.

-26-

interest in disclaimed property, and, consequently, creditors are
unable to reach the disclaimed interest, even if the debtor is
insolvent at the time the disclaimer is executed. <u>Gaughan v.</u>
<u>Edward Dittlof Revocable Trust (In re Costas)</u>, 555 F.3d 790, 793-
94 (9th Cir. 2009), relying on <u>U.S. v. Irvine</u>, 511 U.S. 224
(1994). Therefore, if no property interest exists there can be no
transfer, and the mere fact of insolvency cannot create a property
interest where there was none to begin with under state law.

     The Defendants' argument is circular. They do not deny that
profits from a firm's work in process are a property right of the
partnership, at least when there is no partnership agreement to
the contrary. Clearly, on February 9, 2003, the day before the
Jewel Waiver, Brobeck had a right to recover such profits from any
departing partner under its existing partnership agreement. On
February 10, 2003, via the Jewel Waiver, Brobeck no longer had
that right. The court rejects Defendants' argument that Brobeck's
right to its Unfinished Business profits never "sprang" into
existence because such a right did not exist until dissolution;
the right was there all along, until the Jewel Waiver.

     Furthermore, although Defendants make an interesting analogy,
the court rejects their notion that the Jewel Waiver functioned
like a disclaimer. The California Legislature has explicitly
provided special treatment for disclaimers (<u>see</u> Cal. Probate Code
§§ 275-288, 295), and if it wished to treat waivers of rights to
unfinished business profits in the same manner it would have done
so.

     Therefore, the Unfinished Business profits were property of

-27-

1  Brobeck at the time of the Jewel Waiver.

2      **2.   The Jewel Waiver Transferred Brobeck's Unfinished**
3           **Business To The Partners.**

4      The Bankruptcy Code broadly defines transfer to encompass
5  every "mode, direct or indirect, absolute or conditional,
6  voluntary or involuntary, of disposing of or parting with property
7  or with an interest in property . . . ." 11 U.S.C. § 101(54).

8      The hallmark of a "transfer" is a change in the rights of the
9  transferor with respect to the property after the transaction.
10 Towers v. U.S. (In re Feiler), 218 B.R. 957 (Bankr. N.D. Cal.
11 1998), aff'd 218 F.3d 948 (9th Cir. 2000).  Waiver of an interest
12 in property constitutes a "transfer."   Kapila v. U.S. (In re
13 Taylor), 386 B.R. 361, 369 (Bankr. S.D. Fla. 2008)(debtor's waiver
14 of an NOL carryback constitutes a transfer).

15     The Dorsey Defendants argue that if "the profits Defendants
16 received" constitute the transferred property, no transfer
17 occurred as they received no profits from Unfinished Business in
18 the aggregate.  This argument too is circular and conflates what
19 is transferred with its value.  In a claim for fraudulent
20 transfer, the value of the property transferred does not undo the
21 fact that there was a transfer for which the transferee may be
22 liable.  Here, if what was transferred has no net value, then the
23 Trustee will ultimately recover nothing.  However, since these
24 adversary proceedings have been bifurcated into two phases,
25 liability and damages, what the Trustee may or may not recover
26 remains for another day.

27     Undisputedly, Brobeck (through the execution of the Jewel
28 Waiver by its partners), waived its interest in its Unfinished

-28-

Business profits, thereby changing its rights with respect to those profits.  The Jewel Waiver legitimately and effectively gave what was otherwise property of Brobeck to the Brobeck partners.

The court concludes that Brobeck had a property interest in its Unfinished Business profits, and that the Jewel Waiver transferred that interest to the Brobeck partners.  The court now turns to each of the Trustee's fraudulent transfer claims.

**D.    The Jewel Waiver Was A Fraudulent Transfer.**

    **1.    Claim 6: Actual Fraudulent Transfer Under Section 548(a)(1)(A).**

For a claim under section 548(a)(1)(A),[29] the Trustee has the burden of proving, by preponderance of the evidence, that Brobeck's Unfinished Business profits were property of Brobeck, that the transfer of such profits occurred within one year prior to the filing of Brobeck's bankruptcy petition, and that such transfer was made with the actual intent to hinder, delay, or defraud Brobeck's creditors.[30]  <u>Brandt v. nVidia Corp. (In re 3dfx Interactive, Inc.)</u>, 389 B.R. 842, 863-64 (Bankr. N.D. Cal. 2008).

---

[29]  Section 548(a)(1)(A), as applicable in these proceedings, states:

> (a)(1) the Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily -
>
> > (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

[30] It is undisputed that the Jewel Waiver occurred within one year of Brobeck's bankruptcy petition.  The date the partners gave the Jewel Waiver is the date of the transfer for purposes of fraudulent transfer.  <u>See</u> section 548(d).

-29-

1  In light of the court's previous rulings in ¶¶ C., 1 & 2, the
2  Trustee need only show this last element.

3      Generally, the party attacking the transfer must show the
4  debtor/transferor acted with actual intent to hinder, delay, or
5  defraud when engaging in the transfer.  However, in cases where
6  the transferee controls or is in a position to control the
7  debtor/transferor's disposition of its property, then the
8  transferee's intent can be imputed to the debtor/transferor.
9  Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 806
10 (9th Cir. 1994), citing Consove v. Cohen (In re Roco Corp.), 701
11 F.2d 978, 984 (1st Cir. 1983).  This is such a case.

12      The Trustee contends that the transfer represented by the
13 Jewel Waiver was made with actual intent to hinder, delay or
14 defraud Brobeck's creditors because the Brobeck partners knowingly
15 entered into it to get around the default rules of RUPA and Jewel,
16 and each was well aware of the effect it would have on creditors
17 via the Consent Memo - two factors that provide clear proof of an
18 actual intent to deny creditors the profits to which they were
19 entitled.

20      The Defendants contend that even if the Jewel Waiver
21 constituted a transfer of an interest in property, the Trustee has
22 failed to meet his burden to prove the Brobeck partners intended
23 to defraud creditors, especially when the Partner Defendants have
24 testified to the contrary.  Furthermore, even though they agree
25 with the Trustee's facts regarding the Jewel Waiver, they argue
26 that such facts do not show an actual intent to hinder, delay or
27
28

                              -30-

1 defraud Brobeck's creditors.[31]  The court agrees.

2     As Defendants note, the mere fact of considering and entering
3 into the Jewel Waiver, along with the Consent Memo, does not show
4 actual intent because California law expressly permits and
5 encourages _Jewel_ agreements, which is necessarily inconsistent
6 with actual fraud.  Furthermore, although the Trustee provided
7 email discussions among the Brobeck partners asking questions
8 about the Jewel Waiver's potential effect on creditors, he
9 presented no evidence suggesting that any Brobeck partner believed
10 approving the Jewel Waiver would delay, hinder or defraud any
11 creditor.  In fact, Partner Defendants Bolding and Hermann
12 testified that they believed the Jewel Waiver would benefit
13 creditors, and Hermann testified that he favored the Jewel Waiver
14 because it benefitted creditors, even though he, personally,
15 likely was giving up more than he was getting by it.  Finally, the
16 Trustee produced no evidence on which of Brobeck's 160+ partners
17 voted to approve the Jewel Waiver, or what reasons they had for
18 voting to approve it.

19     "Actual intent" is a question of fact reserved for the jury

20

21     [31]  Orrick and Dorsey argue that Trustee's claims against the
22 Firms must fail because, unlike the Partner Defendants, there was
never any fiduciary or contractual relationship between Brobeck
23 and the Firms.  Accordingly, Brobeck (and thus the Trustee) cannot
recover against the Firms for fees earned on work done by non-
24 Brobeck personnel or by attorneys who were not partners of Brobeck
at the time of dissolution.
25     The court rejects this argument.  While this may be true for
an accounting and turnover claim, a fiduciary or contractual
26 relationship is unnecessary for a successful fraudulent transfer
claim.  Here, the Firms are immediate transferees of the Brobeck
27 partners.  Therefore, if the Trustee can recover profits from
Brobeck's Unfinished Business, he can recover from not only the
28 Partner Defendants but from the Firms as well, subject to any
defenses available to the Firms in section 550(b)(1).

-31-

or trial court (<u>Slater v. Bielsky</u>, 183 Cal. App. 2d 523, 527 (1960)), and summary judgment in the Trustee's favor on Claim 6 would be appropriate only if "the evidence, viewed in a light most favorable to the non-moving party, presents [no] genuine issues of material fact." <u>Warren v. City of Carlsbad</u>, 58 F.3d 439, 441 (9th Cir. 1995). Given the subjective nature of actual intent and the evidence presented by the parties, the court cannot say that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Therefore, the court denies Trustee's motion for partial summary judgment as to all Defendants on Claim 6. The same is true for the Defendants with respect to their motions for summary judgment on Claim 6. On this record, the court cannot conclusively determine that a trier of fact could not find in the Trustee's favor.[32] As a result, the court denies the Defendants' motions on Claim 6.[33]

**2. Claim 7: Constructive Fraudulent Transfer Under Section 548(a)(1)(B).**

In the alternative, the Trustee argues that the Jewel Waiver constitutes a constructive fraudulent transfer under section

---

[32] The parties also rely on a "badges of fraud" argument, listing the traditional components of that theory to support or defeat the actual fraudulent claims, both under the Bankruptcy Code and California law. However, the inquiry is inherently fact-driven, and the court will not grant summary judgment to either party for the reasons stated above.

[33] However, the court grants Partner Defendant James Baker summary judgment on Claim 6, as explained in the following discussion of Claim 7.

-32-

548(a)(1)(B).[34]  At trial, and on his motion, the Trustee has the burden of proving, by preponderance of the evidence, that: (1) Brobeck had an interest in its Unfinished Business; (2) a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) Brobeck was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) Brobeck received "less than a reasonably equivalent value in exchange for" the Jewel Waiver.  3dfx, 389 B.R. at 863; Spear v. Global Forest Prods. (In re Heddings Lumber & Bldg. Supply, Inc.), 228 B.R. 727, 729 (9th Cir. BAP 1998).

Conversely, on the Defendants' summary judgment motions, once the Trustee has made a prima facie case that Brobeck received less than a reasonably equivalent value, the Defendants have the burden to show they provided Brobeck a reasonably equivalent value in exchange for the Jewel Waiver.  Johnson v. Drew, 218 Cal. App. 2d 614, 619 (1963).

Since the first three elements have been established, only the fourth element is at issue in these motions.

---

[34] Section 548(a)(1)(B) provides, in relevant part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily
. . . .

    (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

        (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .

-33-

## a.    Reasonably Equivalent Value.

Determining whether a debtor received a reasonably equivalent value is a two-step process. <u>Jordan v. Kroneberger (In re Jordan)</u>, 392 B.R. 428, 441 (Bankr. D. Idaho 2008); <u>Barber v. Dunbar (In re Dunbar)</u>, 313 B.R. 430, 437 (Bankr. C.D. Ill. 2004).

First, the court must determine that the debtor received value in exchange for the transfer.  <u>Id.</u>  "Value" is defined by the Bankruptcy Code for fraudulent transfer purposes as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ."  <u>See</u> 11 U.S.C. § 548(d)(2)(A); <u>Wyle v. C.H. Rider & Family (In re United Energy Corp.)</u>, 944 F.2d 589, 595 (9th Cir. 1991).  A transfer is for value if one is the quid pro quo of the other.  <u>Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)</u>, 267 B.R. 602, 612 (8th Cir. BAP 2001); <u>Christians v. Crystal Evangelical Free Church (In re Young)</u>, 82 F.3d 1407, 1415 (8th Cir. 1996) <u>vacated on other grounds</u>, 521 U.S. 1114 (1997)(the language "in exchange for" in section 548 contemplates a quid pro quo).

Second, if there was value in exchange, the court must determine whether the value of what was transferred was reasonably equivalent to what the debtor received.  <u>Jordan</u>, 392 B.R. at 441; <u>Dunbar</u>, 313 B.R. at 437.  "In determinating whether a transfer has been for an exchange of reasonably equivalent value, the court analyzes all the circumstances surrounding the transfer."  <u>3dfx</u>, 389 B.R. at 862, citing 5 <u>Collier on Bankruptcy</u> ¶ 548.05[1][b] at 548-35 (15th ed. rev. 2002).  <u>See Jordan</u>, 392 B.R. at 441 (holding and citing same).  The determination of reasonable equivalence must be made as of the time of the transfer.  <u>BFP v. Resolution</u>

-34-

1 <u>Trust Corp.</u>, 511 U.S. 531, 546 (1994).

2   Reasonable equivalence does not require exact equality in
3 value, but means "approximately equivalent" or "roughly
4 equivalent." <u>Id.</u> at 540 n.4.  Indirect benefits, those which come
5 from one other than the recipient of the payments, along with
6 direct benefits, may constitute value if sufficiently concrete and
7 identifiable.  <u>Frontier Bank v. Brown (In re N. Merch., Inc.)</u>, 371
8 F.3d 1056, 1058 (9th Cir. 2004).

9   "Because the policy behind fraudulent transfer law is to
10 preserve assets of the estate, reasonably equivalent value is
11 determined from the standpoint of creditors; it is not determined
12 from the defendant's perspective."  <u>3dfx</u>, 389 B.R. at 863, citing
13 <u>N. Merch.</u>, 371 F.3d at 1059 (proper focus is on the net effect of
14 the transfers on debtor's estate and the funds available to
15 unsecured creditors).  <u>See</u> <u>Kirkland v. Risso</u>, 98 Cal. App. 3d 971,
16 977 (1979)(California courts apply same standard).

17   However, despite this broad analysis, "the requirement that
18 the debtor must have 'received' the value in question expresses a
19 temporal condition demanding an element of contemporaneity in the
20 determination of whether something close to the reasonable
21 equivalence has been exchanged." <u>Jackson v. Mishkin (In re Adler,</u>
22 <u>Coleman Clearing Corp.)</u>, 263 B.R. 406, 466-67 (S.D. N.Y. 2001).
23 Items of value coming to the debtor after the transfer must be
24 excluded as any part of consideration, at least when it was not
25 bargained for at the date of the original transaction.  5 <u>Collier</u>
26 <u>on Bankruptcy</u> ¶ 548.05[1][b] at 548-38.

27       **b.   Contentions.**

28   The Trustee dismisses the Defendants' contention that the

-35-

following activities amount to value in exchange for the Jewel
Waiver: assisting with collecting pre-dissolution accounts
receivable, executing mutual waivers releasing each other and
Brobeck from any claims relating to Unfinished Business, relieving
Brobeck of the obligation to complete Unfinished Business and/or
account for it, avoiding malpractice claims against Brobeck or
disputes that would have arisen had Brobeck retained the
Unfinished Business, enabling Brobeck to complete the work in
Western, expending significant time preparing Western fee
applications for Brobeck without compensation, assisting former
Brobeck employees to find jobs, and assembling and returning files
back to Brobeck clients.  These activities, he argues, are either
pre-existing fiduciary duties required by RUPA § 16404, ethical
obligations of Rule 3-700(D) [Papers, Property and Fees] of the
California Rules of Professional Conduct ("CRPC"), or are mere
admirable gestures, none of which have any value or constitute
consideration in exchange.

Moreover, he contends, even if those activities amount to
value, nothing conditions the Jewel Waiver upon the former
partners' collection of pre-dissolution accounts receivable,
assisting in the orderly transition of client work, or anything
else, or suggests that the Jewel Waiver was linked in any way to
the satisfaction of those independent obligations.  Finally, the
Trustee rejects the Dorsey Defendants' contention that taking over
Brobeck's former office space in Irvine, California is value
because, again, nothing in the FPA or Jewel Waiver makes reference
to assuming the lease in exchange.

In response, the Defendants contend that the activities the

-36-

Trustee asserts have no value are not what they are relying on to show value.  Even if they were, the pre-existing duty rule does not apply here because mutual agreement between parties to substitute new duties is adequate consideration for their second agreement.  Second, each Brobeck partner and Brobeck agreed there would be no duty to account for future Unfinished Business profits (with the exception of Western and Tickets.com) and elimination of claims or compromises of disputes can constitute reasonably equivalent value given in exchange for a transfer.  Third, the Trustee is considering only a small portion of Brobeck's Unfinished Business, and only a small number of partners.[35] Finally, the Trustee fails to recognize that Brobeck received $19 million in fees from Western that it would not have received absent the Jewel Waiver, while the confidential amount Orrick received pales in comparison, and Dorsey contends it received no profits.[36]

>    **c.   Step 1: Whether Brobeck Received Value <u>In Exchange For</u> The Jewel Waiver.**

The court concludes that even if what the Partner Defendants provided Brobeck constitutes value, such value was not "in

---

[35] As noted previously, this argument is irrelevant as to claims for fraudulent transfer.

[36] The Defendants also argue that the testimony of Trustee's designated witness under Fed. R. Civ. P. 30(b)(6), testimony to which the Trustee is bound, was that the Trustee has not performed any investigation on value and does not know whether Brobeck transferred away more value than it received, or received more than it transferred, or which scenario was more likely than the other, and therefore he cannot meet his burden to establish that Brobeck received less than a reasonably equivalent value.
Since this is only the liability phase of these adversary proceedings, such evidence is not necessary.  At trial, the Trustee will have to prove how much, if any, profit he is entitled to.

-37-

exchange for" the Jewel Waiver.[37]  Defendants either provide no
evidence that any of the items they contend benefitted Brobeck
were actually bargained for in exchange for the Jewel Waiver, or
even if some of them were, such items are required by law or
professional ethics rules and hence do not constitute value in
exchange.

The Partner Defendants rely heavily on the fact that by
carving Western out of the Jewel Waiver, Brobeck received $19
million in fees it would have not received otherwise, and since
the confidential amount Orrick received pales in comparison, and
Dorsey contends it received no profits, then Brobeck actually got
the better end of the deal.  This reliance is misplaced.  On
February 9, 2003, Brobeck's inventory of work in process was
property of Brobeck.  That included Western.  The critical words
of the Jewel Waiver bear repeating:

> [N]either the Partners nor the Partnership shall have
> any claim to . . . matters ongoing . . . other than the
> entitlement for collections of amounts due for work
> performed . . . prior to their departure . . . .  The
> provisions of this Section 9(e) are intended to expressly
> waive, opt out of and be in lieu of any right . . . the
> Partnership may have to 'unfinished business'. . . .

The Brobeck partners, via Section 9(e)(i) of the FPA, chose
to deal with Western in a different manner than Brobeck's other
cases by carving it out of what section 9(e) defined as Unfinished
Business and keeping it for themselves:

> The Partners through the Partnership shall be and remain
> entitled to amounts to which any former Partner . . . may
> otherwise become entitled in respect of amounts paid for

---

[37] Partner Defendant Wirth is the exception to this rule.  The
court cannot conclusively determine that what she provided Brobeck
did not constitute value in exchange for the Jewel Waiver, as will
be discussed later in this Memorandum Decision.

-38-

1    legal services conducted after the former Partner's
2    dissociation from the Partnership . . . (emphasis added).

3    Thus, on the transfer date of February 10, 2003, Brobeck
4    still had Western.  The Brobeck partners did not have Western to
5    trade; it was Brobeck's property all along.  The Partner
6    Defendants cannot defend a fraudulent transfer claim by asserting
7    that they gave Western to Brobeck in exchange when they had no
8    right to Western in the first place.  Consequently, the
9    Defendants' pre-existing duty rule argument fails as well.  Since
10   the Brobeck partners did not have Western to give, the release of
11   their claims against Brobeck for the $19 million in fees cannot
12   constitute value, or "new consideration," in exchange for the
13   Jewel Waiver.

14   Several of the Partner Defendants also claim that in exchange
15   for the Jewel Waiver the Brobeck partners released claims they may
16   or would have had against one another for Unfinished Business
17   profits, and this constitutes value to Brobeck.  Although waiving
18   or compromising disputed claims between parties can be considered
19   reasonable equivalent value (see Jordan, 392 B.R. at 442), and the
20   Brobeck partners certainly benefitted from their mutual waivers,
21   the court cannot determine how Brobeck benefitted from this
22   arrangement.  Furthermore, even if Brobeck did benefit, the
23   Defendants failed to quantify its value.  The court cannot
24   quantify it either, and therefore it cannot constitute value for
25   purposes of these motions.

26   The same is true with their argument that taking on
27   Unfinished Business to their new firms, as opposed to leaving
28   these matters with Brobeck, avoided malpractice claims against

-39-

Brobeck. Such claims are speculative and none of the Partner Defendants attempted to quantify the value of these alleged avoided malpractice claims or what economic value they provided to Brobeck.

As to Defendants' other activities (e.g., collecting accounts receivables), even though the FPA obligated the Brobeck partners to assist in billing all unbilled time and expenses and in collecting all receivables in cases for which that partner is or was the responsible billing partner, no evidence exists in the record that a partner had to perform any of these tasks in exchange for the Jewel Waiver. Additionally, the obligation to assist in billing time and expenses, collecting pre-dissolution receivables, assembling and returning files to clients, assisting in the orderly transition of client work and other related activities, are not only obligations imposed on all partners of a law partnership whether in dissolution or a going concern, but also ethical obligations imposed on all attorneys under CRPC 3-700(D), and the Bus. & Prof. Code § 6068 ("BP"). See Lister v. State Bar, 51 Cal. 3d 1117, 1126 (1990) (citing CRPC 3-700(d), before withdrawing attorneys must take "reasonable steps" to avoid foreseeable prejudice to client's rights, and such steps include giving the client "due notice," allowing time for employment of other counsel, and returning client files and papers); Matter of Brockway, 4 Cal. State Bar Ct. Rptr. 944, 951 (2006)(failing to take action on client's behalf and abandoning client matter is tantamount to withdrawal, justifying attorney discipline); and see BP § 6068(m)(attorneys have a duty to keep clients reasonably informed of significant developments in their matters). The court

-40-

1 believes these several obligations would exist upon a law firm's
2 dissolution.

3    If for some reason all of the Brobeck partners were rendered
4 unable to perform these activities, the foregoing law and ethical
5 obligations mandates the completion of these tasks by someone,
6 with or without the Jewel Waiver.  Furthermore, Citibank had a
7 lien on Brobeck's pre-dissolution receivables and the Partner
8 Defendants were personally liable for a significantly large sum of
9 money, thus providing an alternative incentive to bill and collect
10 receivables having nothing to do with the Jewel Waiver.  Because
11 of these extraneous obligations, combined with the lack of any
12 evidence of an explicit agreement, the court rejects the Partner
13 Defendants' assertion that these activities were "in exchange for"
14 the Jewel Waiver.

15    The court now addresses the specific position of each
16 Partner Defendant.  Partner Defendant Arrington testified that in
17 exchange for the Jewel Waiver in his favor, he only provided the
18 mutual waiver in favor of all the other Brobeck partners.  As
19 stated above, the court cannot determine how Brobeck benefitted
20 from the partners' mutual waiver, and thus that does not
21 constitute value for him.

22    Partner Defendant John Baker testified that he completed many
23 tasks which "assisted" the estate, such as obtaining employment
24 for all of the Irvine office employees, and assisting in defending
25 WARN Act claims against the estate, thereby avoiding or reducing
26 claims or lawsuits against Brobeck.  However, he did not testify
27 that any of these tasks were done "in exchange for" the Jewel
28 Waiver.  Further, he did not attempt to quantify what these

-41-

potential claims or lawsuits were worth or what economic value
they provided to Brobeck.

In addition to the mutual waiver theory just rejected by the
court, Partner Defendant Bancroft testified that Brobeck failed to
provide her (and other Brobeck partners) compensation for December
2002, and January and February of 2003.  However, she did not
testify that she waived this compensation claim against Brobeck,
or that she waived it in exchange for the Jewel Waiver.

Besides engaging in collection efforts and providing the
mutual waiver, Partner Defendant Hayes testified that in exchange
for the Jewel Waiver he waived his claim against Brobeck for
fraudulently inducing him to leave a solvent firm for an insolvent
one, but then later testified that he had not waived that claim.

Partner Defendant Santagata raises a similar claim.  He
testified that in exchange for the Jewel Waiver he gave up his
right to a guaranteed payment Brobeck owed him from 2002 (that was
eliminated through an amendment of the FPA) but then stated that
he could be wrong about that fact.

Partner Defendant Wirth testified that she provided value to
Brobeck in exchange for the Jewel Waiver by assisting, primarily
at her own expense, the estate in defending WARN act claims filed
by former Brobeck employees and numerous other related activities.
Wirth has presented sufficient evidence for purposes of these
motions that she may have given Brobeck value in exchange for the
Jewel Waiver.

Partner Defendant Hermann testified that although he believed
he benefitted little from the Jewel Waiver, the value he provided
in exchange was the mutual waiver and those tasks the court has

-42-

1 determined were required by law and professional ethics rules.
2 Thus, they do not constitute value in exchange.

3     Partner Defendant Bolding offered no testimony on what he
4 provided to Brobeck in exchange for the Jewel Waiver.  Partner
5 Defendant Holden, whose diligent efforts undoubtedly enabled
6 Brobeck to receive its $19 million in fees from Western, presents
7 a slightly more compelling case of "in exchange for."
8 Nonetheless, his case is problematic.  Holden admits taking
9 Unfinished Business with him to Orrick.  He offers no testimony on
10 what he provided to Brobeck in exchange for the Jewel Waiver,
11 other than testifying extensively as to his acknowledged
12 successful efforts in Western.  As stated above, Western was never
13 part of Brobeck's Unfinished Business.  Further, the work Holden
14 performed on Western was dictated by another agreement, which has
15 not been challenged as a fraudulent transfer.  Therefore, Holden's
16 efforts on Western, if that is what he asserts as value he
17 provided to Brobeck, including those activities for which he
18 received compensation and those for which he did not, could not
19 have been value provided in exchange for the Jewel Waiver.

20     Partner Defendant James Baker testified that he provided value
21 to Brobeck by helping his assistant and two associates find
22 employment.  Since James Baker is entitled to summary judgment for
23 the reasons stated below, the court need not reach a conclusion on
24 this issue.

25     Finally, as to immediate transferee Dorsey and its claim that
26 taking over Brobeck's former Irvine, California office space was
27 value to Brobeck, while perhaps benefitting the estate, there is
28 nothing on this record indicating that it was done in exchange for

-43-

the Jewel Waiver.

        **d.     Step 2: Whether The Value Of The Jewel Waiver Was Reasonably Equivalent To What Brobeck Received.**

    The court has determined that Dorsey Defendants Arrington, John Baker, Bancroft, Hayes, and Santagata, and Orrick Defendants Bolding, Hermann and Holden gave no value to Brobeck "in exchange for" the Jewel Waiver. Thus the court does not need analyze whether they <u>gave</u> reasonably equivalent value for what they received. This is because, as a matter of law of this case, they gave <u>nothing</u> in return for whatever profits they realized on Unfinished Business. All that remains for the Trustee to prove at trial is the amount, if any, of those profits.

    However, if any of the Defendants in support of their own motion have shown that they took no Unfinished Business with them, or that what they did take resulted in no profits, and the Trustee failed to sufficiently rebut this evidence, then that Defendant can prevail on summary judgment as to all fraudulent transfer claims. There is one such Defendant.

    The record shows that Partner Defendant James Baker took Unfinished Business with him, that he may or may not have given value in exchange for that business, but due to the largest billing client's failure to pay its bill, there was no net profit as to him. The Trustee has not rebutted this evidence. Therefore, Defendant James Baker is entitled to summary judgment on Claim 7.[38]

    The court also notes that even though Defendant Bolding

---

[38] As will be explained later, Partner Defendant James Baker is also entitled to summary judgment on Claims 8 and 9.

-44-

offered no testimony as to what value he provided Brobeck in exchange for the Jewel Waiver, he also testified that he took no Unfinished Business with him. The documents Orrick submitted are inconclusive on that fact. In one exhibit, which reflects the Unfinished Business matters each of the former Brobeck partners worked on at Orrick between February 1, 2003 and February 28, 2005, Bolding's name appears as being responsible for five matters. Yet, in another exhibit reflecting essentially the same information but dated from February 1, 2003 to July 31, 2008, Bolding's name and the five matters are absent. This presents a material fact in dispute. Consequently, Bolding is not entitled to summary judgment on Claim 7, nor is the Trustee is entitled to partial summary judgment as to Bolding on Claim 7. At trial, the Trustee will have to prove both liability and damages regarding Bolding on this claim.

Finally, since Partner Defendant Wirth testified that she took Unfinished Business with her but provided what the court determines could be value to Brobeck in exchange for the Jewel Waiver, the Trustee is not entitled to partial summary judgment as to liability against Wirth. At trial, the Trustee will have to prove both liability and damages regarding Wirth on this claim.

As to the remaining Partner Defendants Arrington, John Baker, Bancroft, Hayes, Santagata, Hermann and Holden, because they failed to provide value to Brobeck in exchange for the Jewel Waiver, the Trustee is entitled to partial summary judgment as to liability against all of them on Claim 7.

As to the immediate transferee Firms, since some of the initial transferee Partner Defendants failed to provide value to

-45-

Brobeck in exchange for the Jewel Waiver, and because the Firms have not asserted any good faith defense available under section 550(b) – taking for value without knowledge of the fraudulent transfer – the Trustee is entitled to partial summary judgment as to liability against the Firms on Claim 7.  At trial, the Trustee must prove the amount he is entitled to recover, if any.

### 3. Claim 8: Actual Fraudulent Transfer Under Cal. Civ. Code § 3439.04.

In addition to the elements of an actual fraudulent transfer under section 548(a)(1)(A), Cal. Civ. Code § 3439.04[39] requires that the Trustee prove Brobeck failed to receive reasonably equivalent value in exchange for the transfer.

As with Claims 6 and 7, because of the uncontroverted evidence presented by Partner Defendant James Baker, the court grants him summary judgment on Claim 8.

---

[39] Cal. Civ. Code § 3439.04, as applicable in these proceedings, states:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

-46-

For the reasons stated above regarding Claim 6, the court denies Trustee's motion for partial summary judgment on Claim 8 due to the lack of evidence of actual intent. Likewise, the court denies summary judgment on Claim 8 as to all remaining Defendants.

**4.   Claim 9: Constructive Fraudulent Transfer Under Cal. Civ. Code § 3439.05.**

For a successful claim under Cal. Civ. Code § 3439.05,[40] the Trustee must prove essentially the same elements as those in section 548(a)(1)(B).

As with Claims 6, 7 and 8, because of the uncontroverted evidence presented by Partner Defendant James Baker, he is entitled to summary judgment on Claim 9.

For the same reasons discussed in Claim 7, the Trustee is entitled to partial summary judgment as to liability against the Firms and the remaining Partner Defendants on Claim 9, with the exception of Partner Defendants Bolding and Wirth. At trial, the Trustee will have to prove both liability and damages regarding these two Partner Defendants on Claim 9.

**5.   Orrick's $500,000 Bonus.**

The Trustee also seeks to recover, as part of Brobeck's Unfinished Business, the $500,000 Orrick received under the bonus

---

[40] Cal. Civ. Code § 3439.05, as applicable in these proceedings, states:

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

-47-

arrangement in Western.  By definition, the fees earned in Western are not part of Brobeck's Unfinished Business.  Accordingly, the Trustee's claim must fail.

On February 10, 2003, the Brobeck partners divided the universe of its work in process into two categories: Western and Tickets.com., and Unfinished Business.  Although the Trustee argues that Western is Unfinished Business, which is the subject of his fraudulent transfer claims, based on Section 9(e)(i) Western was treated as something other than Unfinished Business, and therefore falls outside of the Section 9(e) definition.

Furthermore, the Trustee has not argued that he can recover Orrick's bonus under any theory other than Unfinished Business.  If, in fact, he is asserting a fraudulent transfer claim against Orrick for its bonus, his claim fails because the Western fee arrangement was under an entirely separate agreement which has not been challenged as a fraudulent transfer.

Consequently, the Trustee is not entitled to Orrick's $500,000 bonus it received for services rendered in Western.[41]

## V. CONCLUSION

The Jewel Waiver was valid under California law and cannot be set aside by the Trustee.  All Defendants are entitled to summary judgment on Claims 1, 2, 3, 4 and 5.  The Jewel Waiver was a transfer of interests in Brobeck's property while it was insolvent, and as such can be challenged as a fraudulent transfer

---

[41] Because the court has determined that the Trustee is not entitled to Orrick's $500,000 bonus, it need not address Orrick's Objections To Evidence Submitted In Support Of Trustee's Opposition To Defendants' Motion For Summary Judgment, or Orrick's arguments regarding estoppel and the Trustee's release of Morgan Lewis.

-48-

under applicable Bankruptcy and California law.  Defendants (other than James Baker) are not entitled to summary judgment and the Trustee is entitled to partial summary judgment as explained in this Memorandum Decision.

Counsel for the Trustee should prepare and serve proposed orders consistent with the foregoing, and comply with B.L.R. 9021-1.

The court will conduct a status conference in these two adversary proceedings on August 7, 2009, at 2:30 P.M.

* * *    END OF MEMORANDUM DECISION    * * *

Case: 08-03028   Doc# 69   Filed: 07/02/09   Entered: 07/02/09 13:19:37   Page 49 of 49